1  Patrice L. Bishop (182256)
   service@ssbla.com
2  **STULL, STULL & BRODY**
   9430 W. Olympic Blvd., Suite 400
3  Beverly Hills, CA  90212
   Tel:310-209-2468
4  Fax:310-209-2087

5  *Counsel for Plaintiffs*

6  [Additional Counsel on Signature Page]

7

8  **UNITED STATES DISTRICT COURT**

9  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11  CARYN BENDETOWIES and JILL HERR, | Case No.: 18-cv-06263
    individually and on behalf of all others
12  similarly situated, | **COMPLAINT**

13                          Plaintiffs, | **CLASS ACTION**

14            v. | **JURY TRIAL DEMANDED**

15

16  FACEBOOK, INC.,

17                          Defendant.

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Caryn Bendetowies and Jill Herr ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts respectively pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against defendant Facebook, Inc. ("Defendant" "Facebook," or the "Company").

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action against Facebook for its failure to exercise reasonable care in securing and safeguarding its account holders' Private Information ("Private Information" or "PI").

2.     Facebook operates a social networking platform where its users provide their Private Information  to Facebook under the belief and agreement that Facebook will safeguard that information, and that Facebook will share the information only with the persons, entities, and groups with whom the user consents.  This information includes, without limitation, users' names, emails, addresses, telephone numbers, dates of birth, credit card numbers, private messages, locations, education, work history and photographs.

3.     On information and belief, Plaintiffs' and Class members' PI was stolen by hackers as a result of Facebook's security failures.

4.     Facebook's security failures exposed Plaintiffs' and Class members' Private Information to a massive security breach affecting approximately 50 million Facebook users (the "Security Breach"). The failures put Plaintiffs' and Class members' personal and financial information and interests at serious, immediate, and ongoing risk.

5.     The Security Breach was caused and enabled by Facebook's knowing violation of its obligations to abide by best practices and industry standards concerning the security of its users' Private Information. Facebook failed to comply with security standards and allowed its users' Private Information to be compromised by cutting corners on security measures that could have prevented or mitigated the Security Breach that occurred.

– 1 –

**JURISDICTION AND VENUE**

6.　　The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

7.　　Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 1391(c)(2) because Facebook Inc. is headquartered in this District, it regularly transacts business here and is subject to personal jurisdiction in this District. In addition, the events giving rise to Plaintiffs' causes of action arose, in part, in this District.

8.　　Facebook's Terms of Service, ¶ 15.1, provide in relevant part:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

**THE PARTIES**

**Plaintiffs**

9.　　Plaintiff Caryn Bendetowies is a resident of Florida. Plaintiff Bendetowies has maintained an active Facebook account since 2010.  On or about September 28, 2018, Plaintiff Bendetowies received a notification from Facebook informing her that she was automatically logged out of her Facebook account and would need to log back into her account in order to continuing using Facebook.  This was done as a result of the Security Breach that Facebook discovered on their system on September 25, 2018.  Plaintiff Bendetowies would not have maintained a Facebook account had Defendant told her that it failed to maintain adequate computer systems and data security practices to safeguard her Private Information from theft.

10.　　Plaintiff Jill Herr is a resident of New York. Plaintiff Herr has maintained an active Facebook account since 2008. On or about September 28, 2018, Plaintiff Herr received a notification from Facebook informing her that she was automatically logged out of her Facebook

– 2 –

account and would need to log back in to her account in order to continuing using Facebook. This was done as a result of the Security Breach that Facebook discovered on their system on September 25, 2018. Plaintiff Herr would not have maintained a Facebook account had Defendant told her that it failed to maintain adequate computer systems and data security practices to safeguard her Private Information from theft.

11.     Plaintiffs are also at risk of imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by their PI being placed in the hands of criminals.

12.     Plaintiffs have a continuing interest in ensuring that their PI is protected and safeguarded from future breaches.

13.     Plaintiffs also suffered actual injury in the form of damages to and diminution in the value of their PI—a form of intangible property that Plaintiffs entrusted to Defendant that was compromised in and as a result of the Security Breach.

14.     The injuries suffered by Plaintiffs and Class members as a direct result of the Security Breach include:

        a.     theft of their personal and financial information;

        b.     improper disclosure of their PI;

        c.     the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PI being placed in the hands of criminals and potential sale of Plaintiffs' and Class members' information on the Internet black market; and

        d.     damages to and diminution in value of their PI entrusted to Facebook and the loss of Plaintiffs' and Class members' privacy.

**Defendant**

15.     Facebook, Inc. ("Facebook"), a publicly traded company, is incorporated in the State of Delaware, with its headquarters located at 1 Hacker Way, Menlo Park, California 94025. Facebook is an online social media and social networking service company founded in 2004. Facebook operates a social networking website that enables users to connect, share, and

– 3 –

communicate with each other through text, photographs, and videos as well as to interact with third party apps such as games and quizzes on mobile devices and personal computers.

## FACTUAL BACKGROUND

16.     Since its inception in 2004, Facebook has become synonymous with social media interconnectedness. Facebook now has over two billion monthly active users, with over 200 million in the United States alone.[1]  With each user sharing Private Information in order to access the website, Facebook has become one of the world's largest repositories and aggregators of personal data.[2]

17.     As a purported social media leader, Facebook knows the critical importance of protecting users' Private Information from unauthorized access. Facebook also knows the multitude of harms that foreseeably flow to individual users when information is stolen or misused by criminals.

18.     To its users, Facebook promotes and provides assurances of privacy and the ability for users to control what information is transmitted to third parties. Facebook has explicitly told its users that their Private Information would not be sold, transferred, or otherwise shared to any advertisement network, data broker, or other advertising or monetization-related third party without their expressed consent.

19.     Facebook represents the following on its Facebook Privacy Basics webpage under Facebook's Privacy:

> **We give you control of your privacy**
>
> You should be able to make the privacy choices that are right for you. We want to make sure you know where your privacy controls are and how to adjust them. For example, our audience selector tool lets you decide who you share with for every post. We develop controls based on feedback from around the world.
>
> **We design privacy into our products from the outset**

---

[1]   https://www.statista.com/statistics/398136/us-facebook-user-age-groups/;   https://newsroom.fb.com/company-info/.

[2]   https://www.statista.com/statistics/398136/us-facebook-user-age-groups/;   https://newsroom.fb.com/company-info/.

– 4 –

We design privacy into Facebook products with guidance from experts in areas like data protection and privacy law, security, interface design, engineering, product management, and public policy. Our privacy team works to build these diverse perspectives into every stage of product development.

**We work hard to keep your information secure**

We work around the clock to help protect people's accounts, and we build security into every Facebook product. Our security systems run millions of times per second to help catch threats automatically and remove them before they ever reach you. You can also use our security tools like two-factor authentication to help keep your account even more secure.

**We are accountable**

In addition to comprehensive privacy reviews, we put products through rigorous data security testing. We also meet with regulators, legislators and privacy experts around the world to get input on our data practices and policies.[3]

20.     Facebook's CEO Mark Zuckerberg has also publicly acknowledged the importance of privacy on its platform—stating that people engage and share on Facebook because "they know their privacy is going to be protected."[4]

21.     A vital feature of Facebook is the appearance of control users have over their sensitive Private Information. Facebook's privacy settings purport to offer users degrees of control over the dissemination of their Private Information. Specifically, Facebook gives users the option to share privately with only certain individuals, with all of their Facebook friends, with friends of friends, or with all Facebook users.[5] Users reasonably expect their Private Information will be accessible only to the extent they authorize such access.

22.     However, on information and belief, Defendant failed, and continues to fail, to provide adequate protection of its users' personal and confidential information and has egregiously

---

[3] https://www.facebook.com/about/basics/privacy-principles (last visited Oct. 8, 2018).

[4] Catherine Clifford, *Mark Zuckerberg 9 months ago: People share on Facebook because 'they know their privacy is going to be protected'*, CNBC (April 3, 2018), https://www.cnbc.com /2018/04/03/zuckerberg-on-facebook-and-privacy-before-cambridge-analytica-scandal.html.

[5] Basic Privacy Settings & Tools: Selecting an Audience for Stuff You Share, Facebook, https://www.facebook.com/help/325807937506242/ (last visited Apr. 30, 2018).

– 5 –

1  failed to provide sufficient and timely notice or warning of potential and actual cybersecurity

2  breaches to its Facebook users.

3  **<u>The Facebook Security Breach</u>**

4       23.    On September 28, 2018, Facebook issued a press release announcing that on

5  September 25, 2018, its engineering team discovered an unprecedented security issue which

6  affected over 50 million of its users, and may have affected an additional 40 million users.

7       24.    According to that press release, the Company's engineering team discovered that

8  hackers "exploited a vulnerability in Facebook's code that impacted 'View As' a feature that lets

9  people see what their own profile looks like to someone else."

10       25.    The first bug prompted Facebook's video upload tool to mistakenly show up on the

11  "View As" page. The second one caused the uploader to generate an access token—what allows

12  you to remain logged into your Facebook account on a device, without having to sign in every

13  time you visit—that had the same sign-in permissions as the Facebook mobile app. Finally, when

14  the video uploader did appear in "View As" mode, it triggered an access code for the user for

15  which the hacker was searching.

16       26.    On the morning of September 28, 2018, millions of Facebook users had been

17  automatically logged out of Facebook in order to reset the access tokens of those directly affected

18  by the Security Breach and any additional accounts that had been subject to a "View As" look-up

19  in the last year.  This "View As" feature has been temporarily turned off while Facebook

20  continues to investigate the issue.

21

22

23

24  ///

25  ///

26  ///

27

28

– 6 –

27.    Many Facebook users were notified of the Security Breach through the below message:



28.    After Facebook's announcement of this Security Breach, Senator Mark Warner (D-Virginia), who serves as vice chairman of the Senate Intelligence Committee, called for a "full investigation" into the breach. Warner stated that "[t]oday's disclosure is a reminder about the dangers posed when a small number of companies like Facebook or the credit bureau Equifax are able to accumulate so much personal data about individual Americans without adequate security measures," and further stated that "[t]his is another sobering indicator that Congress needs to step up and take action to protect the privacy and security of social media users."

29.    Later on September 28, 2018, Facebook confirmed that third-party sites that users logged into with their Facebook accounts could also be affected by this Security Breach.  In addition, Facebook said that affected users would see a message at the top of their News Feed about the issue when they log back into the social network where they would be prompted to click and learn more details about what to do if they were not automatically logged out in order to take extra security precautions.

30.    On a call with reporters on September 28, 2018, Guy Rosen, Facebook's Vice President of Products, stated that Facebook has not been able to identify the hackers, or where they

– 7 –

may have originated, but disclosed that they were working with the Federal Bureau of Investigation to identify the attackers.  Rosen further stated that "[t]his is a complex interaction of multiple bugs," and that the hackers likely required some level of sophistication.

31.     Lukasz Olejnik, a security and privacy researcher and member of the W3C Technical Architecture Group stated that "[i]f the attacker exploited custom and isolated vulnerabilities, and the attack was a highly targeted one, there simply might be no suitable trace or intelligence allowing investigators to connect the dots."

32.     On the same September 28, 2018 call with reporters, Facebook Chief Executive Officer, Mark Zuckerberg, with respect to the Security Breach, stated that "[t]his is a really serious security issue, and we're taking it really seriously." He further stated that "I'm glad that we found this, and we were able to fix the vulnerability and secure the accounts, but it definitely is an issue that it happened in the first place."

33.     In a press release issued on October 12, 2018, Facebook stated that the Company "saw an unusual spike of activity that began on September 14, 2018, and we started an investigation. On September 25, we determined this was actually an attack and identified the vulnerability."  That press release also stated, in part:

> First, the attackers already controlled a set of accounts, which were connected to Facebook friends. They used an automated technique to move from account to account so they could steal the access tokens of those friends, and for friends of those friends, and so on, totaling about **400,000 people**. In the process, however, this technique automatically loaded those accounts' Facebook profiles, mirroring what these 400,000 people would have seen when looking at their own profiles. That includes posts on their timelines, their lists of friends, Groups they are members of, and the names of recent Messenger conversations. Message content was not available to the attackers, with one exception. If a person in this group was a Page admin whose Page had received a message from someone on Facebook, the content of that message was available to the attackers.
>
> The attackers used a portion of these 400,000 people's lists of friends to steal access tokens for about 30 million people. For **15 million people**, attackers accessed two sets of information – name and contact details (phone number, email, or both, depending on what people had on their profiles). For **14 million people**, the attackers accessed the same two sets of information, as well as other details people had on their profiles. This included username, gender, locale/language, relationship status, religion, hometown, self-reported current city, birthdate, device types used to access

> Facebook, education, work, the last 10 places they checked into or were tagged in, website, people or Pages they follow, and the 15 most recent searches. For **1 million people**, the attackers did not access any information.

(Emphasis in original.)

34. In addition to the Security Breach, Facebook already faces multiple federal investigations into its privacy and data-sharing practices, including one probe by the Federal Trade Commission ("FTC") and another conducted by the Securities and Exchange Commission. Both have to do with its disclosures around Cambridge Analytica.

35. Moreover, this is the second security vulnerability that Facebook disclosed in recent months. In June, the Company announced it had discovered a bug that made up to 14 million people's posts publicly viewable to anyone for days. This is the first time in Facebook's history, though, that users' entire accounts may have been compromised by outside hackers. However, the prior event should have placed Facebook on notice of its substantial vulnerability.

36. Facebook's treatment of Private Information entrusted to it by its customers fell far short of satisfying its legal duties and obligations. Facebook failed to ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings, and failed to use proper security systems to detect and deter the type of attack that occurred and is at issue here.

37. Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[6]

38. In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which establishes guidelines for fundamental data security principles and practices

---

[6] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited April 4, 2018).

– 9 –

for business.[7]   The guidelines note businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.   The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

39.   The FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[8]

40.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

41.   Facebook was at all times fully aware of its obligation to protect the Private Information of its account holders.   Facebook was also aware of the significant repercussions if it failed to do so because it collected Private Information on a daily basis from its account holders and Facebook knew that this data, if hacked, would result in injury to account holders, including Plaintiffs and Class members.

---

[7] Federal Trade Commission, *Protecting Private Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 4, 2018).

[8] Federal Trade Commission, *Start With Security*, *supra* n. 6.

– 10 –

**Security Breaches Lead to Identity Theft**

42.     According to the U.S. Department of Justice Bureau of Justice Statistics, an estimated 17.6 million people were victims of one or more incidents of identity theft in 2014.[9]

43.     Similarly, the FTC cautions that identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[10] Identity thieves use stolen Private Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[11]

44.     Private Information—is a valuable commodity to identity thieves. Plaintiffs' and Class members' Private Information can be sold and traded by cyber criminals on the dark web. Criminals often trade the information on the dark web for a number of years.

45.     The National Institute of Standards and Technology ("NIST") categorizes the combination of names and credit card numbers as sensitive and warranting a higher impact level based on the potential harm when used in contexts other than their intended use.[12] Private information that is "linked" or "linkable" is also more sensitive. Linked information is information about or related to an individual that is logically associated with other information about the individual. Linkable information is information about or related to an individual for which there is a possibility of logical association with other information about the individual.

---

[9] *See Victims of Identity Theft, 2014*, DOJ, at 1 (2015), available at https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited September 18, 2018).

[10] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, at 3 (2012), available at http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited September 18, 2018).

[11] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

[12] Erika McCallister, et al., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PI)*, National Institute of Standards and Technology Special Publication 800-122, 3-3, available at http://ws680.nist.gov/publication/get_pdf.cfm?pub_id=904990 (last visited September 18, 2018).

– 11 –

An example of linking information the NIST report (*see* n.12) cites is a Massachusetts Institute of Technology study showing that 97% of the names and addresses on a voting list were identifiable using only ZIP code and date of birth.

46.     Private information is broader in scope than directly identifiable information. As technology advances, computer programs become increasingly able to scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible.

47.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[13] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

48.     Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349."[14]

///
///
///

---

[13] *Supra,* n.16.

[14] *See* Department of Justice, *Victims of Identity Theft, 2014*, *supra* n. 11 at 6.

– 12 –

49.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of Private Information:[15]



## CLASS ALLEGATIONS

50.    Plaintiffs bring all counts, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Nationwide Class defined as:

> All persons residing in the United States who registered for an account with Facebook and whose personal or financial information was accessed, compromised or stolen from Facebook in the September 2018 Security Breach (the "Nationwide Class").

51.    In the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims under the laws of the individual States, and on behalf of separate State Subclasses, defined as follows:

> All persons residing in Florida who registered for an account with Facebook and whose personal or financial information was

---

[15] Source: "Credit Card and ID Theft Statistics" by Jason Steele, available at: https://www. creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php    (last visited September 18, 2018).

– 13 –

accessed, compromised or stolen from Facebook in the September 2018 Security Breach (the "Florida Subclass").

All persons residing in New York who registered for an account with Facebook and whose personal or financial information was accessed, compromised or stolen from Facebook in the September 2018 Security Breach (the "New York Subclass").

52.     Excluded from the Class and Subclasses are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

53.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

54.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class and Subclasses are so numerous that joinder of all Class members would be impracticable. On information and belief, Class and Subclass members number in the tens if not hundreds of thousands.

55.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class and Subclass members and predominate over questions affecting only individual Class and Subclass members. Such common questions of law or fact include, *inter alia*:

a.      Whether Facebook failed to use reasonable care and commercially reasonable methods to secure and safeguard Plaintiffs' and Class and Subclass members' Private Information;

b.      Whether Facebook properly implemented its purported security measures to protect Plaintiffs' and Class and Subclass members' Private Information from unauthorized capture, dissemination, and misuse;

c.      Whether Facebook took reasonable measures to determine the extent of the Security Breach after it first learned of same;

d.      Whether Facebook's conduct constitutes breach of an implied contract;

– 14 –

e.    Whether Facebook willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and Class and Subclass members' Private Information;

f.    Whether Facebook was negligent in failing to properly secure and protect Plaintiffs' and Class and Subclass members' Private Information;

g.    Whether Plaintiffs and the other members of the Class and Subclasses are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

56.    Facebook engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other Class and Subclass members. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

57.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class and Subclass members because, among other things, all Class members were similarly injured through Facebook's uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Facebook that are unique to Plaintiffs.

58.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other Class and Subclass members they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Class' and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

59.    **Insufficiency of Separate Actions—Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Class and Subclass would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue

– 15 –

hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Facebook. The Class and Subclasses thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

60.     **Injunctive Relief-Federal Rule of Civil Procedure 23(b)(2).**  Defendant has acted and/or refused to act on grounds that apply generally to the Class and Subclasses, making injunctive and/or declaratory relief appropriate with respect to the classes under Fed. Civ. P. 23 (b)(2).

61.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Facebook, so it would be impracticable for Class members to individually seek redress for Facebook's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I

### NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class, or,**
**Alternatively, Plaintiffs and the State Subclasses)**

62.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-61 as though fully set forth herein.

63.     Facebook owes numerous duties to Plaintiffs and the other members of the Class. These duties include:

– 16 –

a.   to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b.   to protect Private Information in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c.   to implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and the other members of the Class of the Security Breach.

64.   Facebook knew or should have known the risks of collecting and storing Private Information and the importance of maintaining secure systems.

65.   Facebook knew or should have known that its security practices did not adequately safeguard Plaintiffs' and the other Class members' Private Information.

66.   Facebook breached the duties it owes to Plaintiffs and Class members in several ways, including:

a.   failing to implement adequate security systems, protocols and practices sufficient to protect Facebook users' Private Information and thereby creating a foreseeable risk of harm;

b.   failing to comply with the minimum industry data security standards during the period of the Security Breach; and

c.   failing to timely and accurately disclose to Facebook users that their Private Information had been improperly acquired or accessed

67.   But for Facebook's wrongful and negligent breach of the duties it owed to Plaintiffs and the other Class members, their PI would not have been compromised.

68.   The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Facebook's negligent conduct.

**COUNT II**

**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class, or,**
**Alternatively, Plaintiffs and the State Subclasses)**

69.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-61 as though fully set forth herein.

70.     In establishing an online user account on Facebook, Plaintiffs and the other members of the Class entered into an implied contract with Facebook, whereby Facebook became obligated to reasonably safeguard Plaintiffs' and the other Class members' Private Information.

71.     Under the implied contract, Facebook was obligated to not only safeguard the Private Information, but also to provide Plaintiffs and the other Class members with prompt, truthful, and adequate notice of any security breach or unauthorized access of said information.

72.     Facebook breached the implied contract with Plaintiffs and the other members of the Class by failing to take reasonable measures to safeguard their PI.

73.     Facebook also breached its implied contract with Plaintiffs and the other Class members by failing to provide prompt, truthful, and adequate notice of the Security Breach and unauthorized access of their PI by hackers.

74.     Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) improper disclosure of their Private Information; (ii) the increased risk of identity theft; and (iii) deprivation of the value of their Private Information, which is likely to be sold to cyber criminals on the dark web.

**COUNT III**

**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Nationwide Class, or,**
**Alternatively, Plaintiffs and the State Subclasses)**

75.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-61 as though fully set forth herein.

76.     Plaintiffs and members of the Class entered into an implied contract that required Defendant to provide adequate security for the Private Information it collected from Plaintiffs' and Class members' payment card transactions.

– 18 –

77. Defendant owes duties of care to Plaintiffs and the members of the Class which would require it to adequately secure Private Information.

78. Defendant still possesses Private Information regarding Plaintiffs and the Class members.

79. Although since the Security Breach Facebook announced that it is monitoring its data security systems to fix the vulnerabilities in its systems which permitted the intrusions and to prevent further attacks, there is no detail on what, if any, fixes have occurred.

80. Plaintiffs and the members of the Class are at risk of harm due to the exposure of their Private Information and Defendant's failure to address the security failings that lead to such exposure.

81. There is no reason to believe that Defendant's security measures are any more adequate than they were before the breach to meet Defendant's contractual obligations and legal duties, and there is no reason to think Defendant has no other security vulnerabilities that have not yet been knowingly exploited.

82. Plaintiffs, therefore, seek a declaration that (1) Facebook's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) to comply with its contractual obligations and duties of care, Facebook must implement and maintain reasonable security measures, including, but not limited to:

    a. ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Facebook's systems on a periodic basis, and ordering Facebook to promptly correct any problems or issues detected by such third-party security auditors;

    b. ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    c. ordering that Facebook audit, test, and train its security personnel regarding any new or modified procedures;

– 19 –

d.   ordering that Facebook create firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   ordering that Facebook conduct regular database scanning and securing checks;

f.   ordering that Facebook routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

g.   ordering Facebook to meaningfully educate its users about the threats they face as a result of the loss of their financial and Private Information  to third parties, as well as the steps Facebook users must take to protect themselves.

## COUNT IV

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class, or,**
**Alternatively, Plaintiffs and the State Subclasses)**

83.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-61 as though fully set forth herein.

84.   California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, Facebook violated (and continues to violate) California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.*, by engaging in the above-described unlawful, unfair, fraudulent, deceptive, untrue, and misleading acts and practices.

85.   Facebook's unfair and fraudulent acts and practices include but are not limited to the following:

a.   Facebook failed to enact adequate privacy and security measures in California to protect the Class members' PI from unauthorized disclosure, release, data breaches, and theft, in violation of industry standards and best practices, which was a direct and proximate cause of the Security Breach;

– 20 –

b.   Facebook failed to take proper action in California following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Security Breach;

c.   Facebook knowingly and fraudulently misrepresented in California that it would maintain adequate data privacy and security practices and procedures to safeguard Class members' PI from unauthorized disclosure, release, data breaches, and theft;

d.   Facebook knowingly and fraudulently misrepresented that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class members' PI;

e.   Facebook knowingly omitted, suppressed, and concealed the inadequacy of its privacy and security protections for Class members' PI;

f.   Facebook failed to maintain reasonable security, in violation of Cal. Civ. Code § 1798.81.5; and

g.   Facebook failed to disclose the Security Breach to Class members in a timely and accurate manner, in violation of the duties imposed by Cal. Civ. Code § 1798.82, *et seq*.

86.   Facebook's acts and practices also constitute "unfair" business acts and practices, in that the harm caused by Facebook's wrongful conduct outweighs any utility of such conduct, and such conduct (i) offends public policy, (ii) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, and/or (iii) has caused and will continue to cause substantial injury to consumers such as Plaintiffs and the California Subclass.

87.   Facebook's acts and practices also constitute "unlawful" business acts and practices by virtue of their violation of the FCRA, 15 U.S.C. §§ 1681e (as described fully above), the GLBA, 15 U.S.C. § 6801, *et seq*. (as described fully above), California's fraud and deceit statutes, Cal. Civ. Code §§ 1572, 1573, 1709, 1711; the California Customer Records' Act, Cal. Civ. Code §§ 1798.80, *et seq*. (as described fully below), and California common law.

– 21 –

88.   There were reasonably available alternatives to further Facebook's legitimate business interests, including using best practices to protect Class members' PI, other than Facebook's wrongful conduct described herein.

89.   As a direct and/or proximate result of Facebook's unfair practices, Plaintiffs and the Class members have suffered injury in fact in connection with the Security Breach, including but not limited to:

  a.   theft of their personal and financial information;

  b.   improper disclosure of their PI;

  c.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PI being placed in the hands of criminals and potential sale of Plaintiffs' and Class members' information on the Internet black market; and

  d.   damages to and diminution in value of their PI entrusted to Facebook and the loss of Plaintiffs' and Class members' privacy.

90.   As a result, Plaintiffs and the Class members are entitled to compensation, restitution, disgorgement, and/or other equitable relief under Cal. Bus. & Prof. Code § 17203.

91.   Facebook knew or should have known that its data security practices and infrastructure were inadequate to safeguard Plaintiffs' and the Class members' PI, and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to Plaintiffs' and the Class members' rights.

92.   On information and belief, Facebook's deceptive, unlawful and unfair business practices, except as otherwise indicated herein, continue to this day and are ongoing.

93.   Plaintiffs' and the Class members also are entitled to injunctive relief, under California Business and Professions Code §§ 17203-04, to stop Facebook's alleged wrongful acts and to require Facebook to maintain adequate security measures to protect the personal and financial information in its possession.

– 22 –

94.     Under Business and Professions Code § 17200, *et seq*., Plaintiffs seek restitution of money or property that Defendant may have acquired by means of its deceptive, unlawful, and unfair business practices (to be proven at trial), restitutionary disgorgement of all profits accruing to Defendant because of its deceptive, unlawful and unfair business practices (to be proven at trial), declaratory relief, and attorney's fees and costs (allowed by Cal. Code Civil Pro. §1021.5).

**COUNT V**

**VIOLATION OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT
Fla. Stat. §§ 501.201, *et seq*.
(Brought on behalf of the Florida Subclass)**

95.     Plaintiff Bendetowies ("Plaintiff," for purposes of this Count), individually and on behalf of the other Florida Subclass members, repeats and re-alleges the allegations contained in paragraphs 1-61 as though fully set forth herein.

96.     At all relevant times, Plaintiff and Florida Subclass members were "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat § 501.201 *et seq*. ("FDUTPA").

97.     Facebook is engaged in trade and commerce in Florida.

98.     Plaintiff and the Florida Subclass entrusted Facebook with their PI.

99.     As alleged in this Complaint, Facebook engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including the following, in violation of the FDUTPA:

      a.     failure to maintain the security of credit and/or debit card account information;

      b.     failure to maintain adequate computer systems and data security practices to safeguard credit and debit card information and other PI;

      c.     failure to disclose that its security systems and data security practices were inadequate to safeguard personal and private information and other PI from theft;

– 23 –

d.   continued acceptance of PI and storage of other Private Information  after Facebook knew or should have known of the security vulnerabilities of the systems that were exploited in the Security Breach; and

e.   allowing unauthorized persons to have access to Facebook users' accounts.

100.   Facebook knew or should have known that its security systems and data security practices were inadequate to safeguard the PI of Plaintiff and Florida Subclass members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

101.   As a direct and proximate result of Facebook's violation of FDUTPA, Plaintiff and the Florida Subclass suffered damages including, but not limited to:

a.   theft of their personal and financial information;

b.   improper disclosure of their PI;

c.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PI being placed in the hands of criminals and potential sale of Plaintiffs' and Class members' information on the Internet black market; and

d.   damages to and diminution in value of their PI entrusted to Facebook and the loss of Plaintiffs' and Class members' privacy.

102.   As a direct result of Facebook's knowing violation of FDUTPA, Plaintiff and the Florida Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

a.   ordering that Facebook engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Facebook's systems on a periodic basis, and ordering Facebook to promptly correct any problems or issues detected by such third-party security auditors;

b.   ordering that Facebook audit, test, and train its security personnel regarding any new or modified procedures;

– 24 –

c.   ordering that Facebook segment PI by, among other things, creating firewalls and access controls so that if one area of Facebook is compromised, hackers cannot gain access to other portions of Facebook's systems;

d.   ordering that Facebook purge, delete, and destroy in a reasonably secure manner PI not necessary for its provisions of services;

e.   ordering that Facebook conduct regular database scanning and security checks;

f.   ordering that Facebook routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

g.   ordering Facebook to meaningfully educate its users about the threats they face as a result of the loss of their financial and Private Information to third parties, as well as the steps its customers must take to protect themselves.

103.   Plaintiff brings this action on behalf of herself and Florida Subclass members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and Florida Subclass members and the public from Facebook's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Facebook's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

104.   Plaintiff and the Florida Subclass seek actual damages under Fla. Stat. § 501.211(2) and all fees, costs, and expenses allowed by law, including attorney's fees and costs, pursuant to Federal Rule of Civil Procedure 23 and Fla. Stat. §§ 501.2105 and 501.211, to be proven at trial.

1
2
3

**COUNT VI**

**VIOLATION OF N.Y. GEN. BUS. LAW § 349**
**(Brought by Plaintiff Herr on behalf of the New York Subclass)**

4      105.    Plaintiff Herr ("Plaintiff," for purposes of this Count), individually and on behalf of

5  the other New York Subclass members, repeats and re-alleges the allegations contained in

6  paragraphs 1-61 as though fully set forth herein.

7      106.    New York General Business Law ("NYGBL") § 349 prohibits deceptive acts or

8  practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in

9  the state of New York.

10     107.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices

11  within the meaning of the NYGBL § 349. The conduct alleged herein is a "business practice"

12  within the meaning of the NYGBL § 349.

13     108.    Defendant stored Plaintiff's and the New York Subclass members' PI in

14  Defendant's electronic and user information databases. Defendant knew or should have known it

15  did not employ reasonable, industry standard, and appropriate security measures that complied

16  "with federal regulations" and that would have kept Plaintiff's and the New York Subclass

17  members' PI secure and prevented the loss or misuse of Plaintiff's and the New York Subclass

18  members' PI. Defendant did not disclose to Plaintiff and the Class members that their data systems

19  were not secure.

20     109.    Plaintiff and the New York Subclass never would have provided their sensitive and

21  personal PI if they had been told or knew that Facebook failed to maintain sufficient security to

22  keep such PI from being hacked and taken by others, and that Facebook failed to maintain the

23  information in encrypted form.

24     110.    Defendant violated the NYGBL §349 by misrepresenting, both by affirmative

25  conduct and by omission, the safety of Defendant's many systems and services, specifically the

26  security thereof, and its ability to safely store Plaintiff's and the New York Subclass members' PI.

27     111.    Defendant also violated NYGBL §349 by failing to implement reasonable and

28  appropriate security measures or follow industry standards for data security, and by failing to

– 26 –

immediately notify Plaintiff and the New York Subclass members of the Security Breach. If Defendant had complied with these legal requirements, Plaintiff and the other New York Subclass members would not have suffered the damages related to the Security Breach.

112.    Facebook's practices, acts, policies and course of conduct violate NYGBL § 349 in that:

a.    Facebook actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff and the New York Subclass at the time they provided such PI that Facebook did not have sufficient security or mechanisms to protect PI;

b.    Facebook failed to give adequate warnings and notices regarding the defects and problems with its system(s) of security systems that it maintained to protect Plaintiff's and the New York Subclasses' PI. Facebook possessed prior knowledge of the inherent defects in its IT systems and failed to address the same or to give adequate and timely warnings that there had been a Security Breach.

113.    Plaintiff and the New York Subclass were entitled to assume, and did assume, Defendant would take appropriate measures to keep their PI safe. Defendant did not disclose at any time that Plaintiff's and the New York Subclass's PI was vulnerable to hackers because Defendant's data security measures were inadequate, and Defendant was the only one in possession of that material information, which it had a duty to disclose.

114.    The aforementioned conduct is and was deceptive, false, and fraudulent and constitutes an unconscionable commercial practice in that Facebook has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the defective security system it maintained and failed to reveal the Security Breach timely and adequately.

115.    Members of the public were deceived by and relied upon Facebook's affirmative misrepresentations and failures to disclose.

116.    Such acts by Facebook are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer providing his or her PI to Facebook.  Said deceptive acts and practices are material. The requests for and use of such PI in New York and/or concerning New York residents and/or citizens was a consumer-oriented act and thereby falls under the New York consumer fraud statute, NYGBL § 349.

117.    Furthermore, as alleged above, Defendant's failure to secure Plaintiff's and the New York Subclass' PI violates the FTCA and therefore violates NYGBL § 349.

118.    Facebook's wrongful conduct caused Plaintiff and the New York Subclass to suffer a consumer-related injury by causing them to incur substantial expense to protect from misuse of the PI materials by third parties and placing the Plaintiff and the New York Subclass at serious risk for monetary damages.

119.    As a direct and proximate result of Facebook's violations of the above, Plaintiff and New York Subclass members suffered damages including, but not limited to:

       a.    theft of their personal and financial information;

       b.    improper disclosure of their PI;

       c.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PI being placed in the hands of criminals and potential sale of Plaintiff's and Class members' information on the Internet black market; and

       d.    damages to and diminution in value of their PI entrusted to Facebook and the loss of Plaintiff's and Class members' privacy.

120.    In addition to or in lieu of actual damages, because of the injury, Plaintiff and the New York Subclass seek statutory damages for each injury and violation which has occurred.

COMPLAINT
Case No. 18-cv-06263

## COUNT VII

**VIOLATION OF NEW YORK DATA BREACH LAWS
– DELAYED NOTIFICATION
N.Y. GEN. BUS. LAW § 899-aa
(Brought by Plaintiff Herr on behalf of the New York Subclass)**

121.    Plaintiff Herr ("Plaintiff," for purposes of this Count), individually and on behalf of the other New York Subclass members, repeats and re-alleges the allegations contained in paragraphs 1-61 as though fully set forth herein.

122.    Section 899-aa(3) of NYGBL requires any "person or business which maintains computerized data which includes private information which such person or business does not own shall notify the owner or licensee of the information of any breach of the security of the system immediately following discovery, if the private information was, or is reasonably believed to have been, acquired by a person without valid authorization."

123.    Section 899(5) of NYGBL states:

The notice required by this section shall be directly provided to the affected persons by one of the following methods:

(a)  written notice;

(b)  electronic notice, provided that the person to whom notice is required has expressly consented to receiving said notice in electronic form and a log of each such notification is kept by the person or business who notifies affected persons in such form; provided further, however, that in no case shall any person or business require a person to consent to accepting said notice in said form as a condition of establishing any business relationship or engaging in any transaction;

(c)  telephone notification provided that a log of each such notification is kept by the person or business who notifies affected persons; or

(d)  Substitute notice, if a business demonstrates to the state attorney general that the cost of providing notice would exceed two hundred fifty thousand dollars, or that the affected class of subject persons to be notified exceeds five hundred thousand, or such business does not have sufficient contact information.  Substitute notice shall consist of all of the following:

(1) e-mail notice when such business has an e-mail address for the subject persons;

– 29 –

1    (2)  conspicuous posting of the notice on such business's web site page, if such business maintains one; and

2    (3)  notification to major statewide media.

3    124.    The Security Breach described in this Complaint constitutes a "breach of the

4    security system" of Defendant.

5    125.    As alleged above, Defendant unreasonably delayed informing Plaintiff and the New

6    York Subclass about the Security Breach, affecting the confidential and non-public Private

7    Information of Plaintiff and the New York Subclass after Defendant knew the Security Breach had

8    occurred.

9    126.    Defendant failed to disclose to Plaintiff and the New York Subclass, without

10   unreasonable delay and in the most expedient time possible, the breach of security of their

11   unencrypted, or not properly and securely encrypted, Private Information when Defendant knew or

12   reasonably believed such information had been compromised.

13   127.    Defendant's ongoing business interests gave Defendant incentive to conceal the

14   Security Breach from the public to ensure continued revenue.

15   128.    Upon information and belief, no law enforcement agency instructed Defendant that

16   notification to the Plaintiff and the New York Subclass would impede Defendant's investigation.

17   129.    As a result of Defendant's violation of New York law, Plaintiff and the New York

18   Subclass were deprived of prompt notice of the Security Breach and were thus prevented from

19   taking appropriate protective measures. These measures would have prevented some or all of the

20   damages Plaintiff and the New York Subclass suffered because their stolen information would not

21   have any value to identity thieves.

22   130.    As a result of Defendant's violation of New York law, Plaintiff and the New York

23   Subclass have suffered incrementally increased damages separate and distinct from those simply

24   caused by the breaches themselves.

25   131.    Plaintiff and the New York Subclass seek all remedies available under New York

26   law, including, but not limited to damages the Plaintiff and the New York Subclass suffered as

27   alleged above, as well as equitable relief.

28

– 30 –

1

## REQUEST FOR RELIEF

2      WHEREFORE, Plaintiffs, individually and on behalf of the other members of the

3  Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor

4  and against Facebook, as follows:

5      A.      Declaring that this action is a proper class action, certifying the Class and

6  Subclasses as requested herein, designating Plaintiffs as Class and Subclass Representatives, and

7  appointing Class Counsel as requested in Plaintiffs' motion for class certification;

8      B.      Ordering Facebook to pay actual damages to Plaintiffs and the other members of

9  the Class and Subclasses;

10     C.      Ordering Facebook to pay punitive damages, as allowable by law, to Plaintiffs and

11  the other members of the Class and Subclasses;

12     D.      Ordering Facebook to pay attorneys' fees and litigation costs to Plaintiffs and their

13  counsel;

14     E.      Ordering Facebook to pay equitable relief, in the form of disgorgement and

15  restitution, and injunctive relief as may be appropriate;

16     F.      Ordering Facebook to pay both pre- and post-judgment interest on any amounts

17  awarded; and

18     G.      Ordering such other and further relief as may be just and proper.

19

## JURY DEMAND

20     Plaintiffs demand a trial by jury on all issues so triable.

21

22                    **STULL, STULL & BRODY**

23  Dated: October 12, 2018          By:  */s/ Patrice L. Bishop*

24                                        Patrice L. Bishop
                                          9430 West Olympic Blvd., Suite 400
25                                        Beverly Hills, CA 90212
                                          Tel:   (310) 209-2468
26                                        Fax:   (310) 209-2087
                                          Email: pbishop@ssbla.com

27

28

– 31 –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Melissa R. Emert
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022
Email:  memert@ssbny.com

Gary S. Graifman
Jay Brody
**KANTROWITZ GOLDHAMER &
    GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Tel:    (845) 356-2570
Fax:    (845) 356-4335
Email:  ggraifman@kgglaw.com
        jbrody@kgglaw.com

Nicholas A. Migliaccio
Jason S. Rathod
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel:    (202) 470-3520
Email:  nmigliaccio@classlawdc.com
        jrathos@classlawdc.com

***Counsel for Plaintiffs***